UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALLEN D. MCCADNEY, | ) | CASE NO. 3:09CV2994 |
| Plaintiff, | ) | |
| v. | ) | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ) ) ) | MEMORANDUM OPINION AND ORDER |
| | ) | |
| Defendant. | ) | |

Allen D. McCadney ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Court REVERSES the Commissioner's decision and REMANDS the instant case for further factfinding, analysis, and articulation by the administrative law judge ("ALJ"):

**I.    PROCEDURAL AND FACTUAL HISTORY**

On June 15, 2006, Plaintiff applied for SSI, alleging disability beginning April 18, 2006. ECF Dkt. #14-6, p. 148-50.[1] The SSA denied Plaintiff's application initially and on reconsideration. ECF Dkt. #14-3, p. 102-103. On March 23, 2007, Plaintiff filed a request for an administrative hearing. ECF Dkt. #14-4, p. 114-15. On March 25, 2009, an ALJ conducted an administrative hearing *via* video conference where Plaintiff was represented by counsel. ECF Dkt. #14-2, pp. 82-100. At the hearing, the ALJ accepted the testimony of Plaintiff and Joseph Havranek, a vocational expert ("VE"). On September 15, 2009, the ALJ issued a Decision ("Decision") denying benefits. *Id.* at 68-79. Plaintiff filed a request for review, ECF Dkt. #14-4, p. 108, which the Appeals Council denied. ECF Dkt. #14-2, p. 64-65.

---

[1]Page numbers refer to "Page ID" numbers in the electronic filing system.

On December 29, 2009, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On June 1, 2010, Plaintiff filed a brief on the merits. ECF Dkt. #16. On July 1, 2010, Defendant filed a brief on the merits. ECF Dkt. #17. No reply brief was filed.

**II.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from psychotic disorder, dysthymic disorder, and lumbar spondylosis, which qualified as severe impairments under 20 C.F.R. §416.920(c). ECF Dkt. #14-2, p. 73. Although there was evidence in the record that Plaintiff had bursitis and tendonitis in his left shoulder, resulting from an automobile accident, the ALJ concluded that there was insufficient evidence in the record to conclude that the condition would last longer than twelve months. As a consequence, the ALJ classified Plaintiff' shoulder pain as a non-severe impairment. *Id.* at 74. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02. 12.04, and 12.06 ("Listings"). *Id.* at 74-75. He ultimately concluded that Plaintiff has the residual functional capacity ("RFC") to perform medium work involving lifting up to fifty pounds occasionally and twenty five pounds frequently; and involving no climbing of ladders, ropes or scaffolds. Plaintiff's work must be limited to simple, routine, repetitive tasks; involving short, simple, routine instructions; few work place changes; occasional interaction with supervisors; and involving no interaction with co-workers or the public. The claimant is unable to perform work requiring high-paced production demands but is able to maintain concentration for a two hour period before a normal break. *Id.* at 75.

**III.   STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment

       which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, __ F.3d __, 2011WL 274792, *3, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v.*

*Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

**V.     ANALYSIS**

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the AJL did not give appropriate weight to the opinion of his treating physician, Dr. Victoria Kelly. More specifically, Plaintiff argues that he is more limited that the ALJ acknowledged in his residual functional capacity assessment and the hypothetical question posed to the VE. Finally, Plaintiff contends that the ALJ erred when he concluded that Plaintiff's shoulder condition would not persist more than 12 months.

With respect to Plaintiff's first argument, an ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

"When a treating physician . . . submits an opinion on an issue reserved to the Commissioner-such as whether the claimant is 'disabled' or 'unable to work'- the opinion is not entitled to any particular weight." *Turner v. Commissioner of Social Security*, No. 09-5543, 2010 WL 2294531 at *4, (6th Cir. June 7, 2010), unreported; *see also* 20C.F.R. §416.927(e)(1). "Although the ALJ may not entirely ignore such an opinion, his decision need only explain the consideration given to the treating source's opinion." *Id*. (internal quotation and citation omitted). In *Turner*, a treating source opined that the claimant was unable to work" and was not "currently capable of a full-time 8-hour workload." *Id*. at *5. The Sixth Circuit held that the ALJ adequately addressed the opinion in stating that it was an opinion on an issue reserved to the Commissioner. *Id*.

Plaintiff was released from Allen Correctional Institute ("ACI") on July 18, 2006. ECF Dkt. #14-9, p. 262. According to prison records, Plaintiff began his incarceration at ACI on August 12, 2003 and he refused mental health testing on August 25, 2003. As a consequence, Plaintiff received no services from the Mental Health Department and resided in the general prison population.

After his release, he was referred for a psychological evaluation by the Bureau of Disability Determination. On July 17, 2006, Plaintiff reported a history of suicidal ideation with no attempts, and difficulty sleeping, but no hallucinatory involvement, paranoid ideation, significant delusions, psychosis, or post-traumatic stress disorder. ECF Dkt. #14-9, p. 255. He stated that he had been

-5-

arrested for various crimes including domestic violence, rape, and assault, and that he had been in prison for sixteen years. *Id.* at 253. Plaintiff told Dr. White that he is quick to anger and often feels bored and empty. A licensed psychologist, Alan White, PhD., subjected Plaintiff to a battery of psychological tests, but concluded that the results were invalid because Plaintiff put forth poor effort, and his responses were vague at best. Dr. White concluded that Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks was mildly impaired due to alcohol abuse. *Id.* at 257. His ability to understand, remember, and follow instructions was not impaired. His ability to relate to others, including fellow workers and supervisors is moderately impaired due to his personality disorder. Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity is moderately impaired due to his alcohol use. *Id.* at 258. Dr. White asked that, in the future, Plaintiff be referred to another examiner.

On July 8, 2006, Plaintiff completed a function report, ECF Dkt. #14-7, p. 183-189, where he indicated that he spent the day walking and talking to himself. He listed his limitations as not being able to stand for a long time or to get along with people, and that he had a difficult time sleeping. He indicated that he took out the trash at his mother's house and he circled "cleaning" and "laundry" as house and yard work that he performs. Although he participated in no social activities, he wrote that he enjoyed playing sports and watching television. With respect to his ability to concentrate, Plaintiff wrote that he hears voices and that he has difficulty completing projects that he starts. He also noted that he can barely read and has difficulty getting along with people.

On September 6, 2006, Dr. Cynthia Waggoner, a state agency psychologist, reviewed Plaintiff's medical records and evaluated his mental functional capacity. ECF Dkt. #14-9, p. 271-88. Dr. Waggoner concluded that Plaintiff suffered from personality disorder and substance addiction disorder, and as a result, Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, and pace, and not episodes of decompensation. *Id.* at 281. Dr. Waggoner further found that Plaintiff was not significantly limited in most areas of mental functioning, including understanding, memory, and sustained concentration and persistence, although he had moderate limitation in maintaining attention and concentration for extended periods, completing a normal workweek, and interacting with others.

*Id.* at 285-286. On January 12, 2007, Dr. Carl Tishler, a state agency psychologist, reviewed Plaintiff's medical records and affirmed the opinion of Dr. Waggoner. ECF Dkt. #4-10, p. 310.

On November 7, 2006, Plaintiff sought mental health treatment at Unison Behavioral Health Group, for auditory hallucinations, depression, agitation, and sleeping problems. *Id.* at 298-307. He was diagnosed with major depressive disorder with psychotic features. On December 28, 2006, Plaintiff's sister completed a function report. According to his sister, Plaintiff was violent and constantly screamed about burning his mother's house. ECF Dkt. 14-7, p. 199-206. Plaintiff's uncle was often called to subdue Plaintiff. *Id.* at 200-201. Plaintiff's mother prepared his meals and washed his clothes. According to the function report, Plaintiff did not shop and did not know what bills are. *Id.* at 202. He has an attitude with family members, has a five second attention span, and does not follow rules or directions. *Id.* at 204. His sister also observed that he is in constant fear for his own safety. *Id.* at 205.

Dr. Victoria Kelly treated Plaintiff at Unison Behavioral Group from January 31, 2007 to March 18, 2009. According to her initial assessment, Plaintiff complained of hearing voices that told him to burn his house down, as well as people, both adults and children, laughing at him. ECF Dkt. #14-13. P. 405. The voices were constant, but got worse at nighttime, so he had difficulty sleeping. He was restless and paced most evenings. His mother limited his access to lighters, matches, and flammable materials. He was quick to anger and often hit walls and smashed things. He denied any suicidal or homicidal thoughts and denied any inclination to burn his mother's house. Dr. Kelly's initial diagnosis was psychotic disorder, NOS, R/O schizophrenia, paranoid type, dysthymic disorder, R/O bipolar I disorder, alcohol, cannabis, and cocaine abuse, R/O learning disorder, and R/O PTSD. Dr. Kelly observed likely borderline intellectual functioning and antisocial personality disorder. *Id.* at 409. Dr. Kelly prescribed Seroquel, Traxadone, and Celexa.

Dr. Kelly's treatment notes reflect that Plaintiff returned to Unison every two months, with some exceptions, through August 13, 2009. Plaintiff was instructed to see Dr. Kelly every month and a nurse and Unison every other week. ECF Dkt. #14-13, p. 410. At his March 2007 appointment, Dr. Kelly prescribed Risperdal instead of Seroquel, because Seroquel made Plaintiff "jittery." Plaintiff indicated that he preferred to sleep during the day because he feels unsafe at

night. He still heard voices. Dr. Kelly wrote, "His affect is very guarded, restricted and blunted, possibly dysphoric. His thoughts appeared linear and goal-directed, but he is easily distracted, but then did appear to be responding to internal stimuli." *Id.* at 402. Dr. Kelly spoke to Plaintiff's mother who said that she was concerned because of Plaintiff's paranoia and his inability to sleep at night. *Id.* at 401.

At his April 2007 appointment, Dr. Kelly prescribed Geodon to replace Risperdal, which Plaintiff reported was having no effect. *Id.* at 398. Dr. Kelly also prescribed Lexapro for depression. *Id.* at 399. Dr. Kelly completed a mental functional capacity assessment on April 25, 2007. ECF Dkt. #14-13, p. 413-14. Dr. Kelly concluded that Plaintiff suffered from depression and psychosis that rendered him unemployable. ECF Dkt. #14-13, p. 414. She found that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions, to sustain an ordinary routine without supervision, to work in coordination with others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods. She further found that Plaintiff would have marked difficulty in accepting instructions from supervisors and responding appropriately to criticism, and getting along with coworkers without distracting them or exhibiting extreme behaviors. According to Dr. Kelly, Plaintiff was moderately limited in most of the remaining categories.

Plaintiff did not appear for his May or June 2007 appointments. At his August 2007 appointment, Plaintiff reported that he had taken his medication regularly over the course of the previous three months despite having missed hiss previous two appointments. *Id.* at 390. Although he reported visual hallucinations of people and animals, he stated that his auditory hallucinations had improved and he was sleeping well. He denied problems with tearfulness, hopelessness, suicidal or homicidal thoughts, but admitted that he became depressed when he heard about several miners that had been buried alive. He reported some jitteriness and dry mouth, but that he planned to continue his medication. Dr. Kelly spoke to Plaintiff's mother, who reported that Plaintiff was "doing fairly well." Plaintiff's mother reported that he would have a moody outburst once a week, but no behavioral problems otherwise.

At his October 2007 appointment, Dr. Kelly reported that, although Plaintiff's auditory and visual hallucinations continued, this was the first appointment "that he had not made an odd comment and became tearful." *Id.* at 387. Plaintiff reported that he fell asleep quickly but woke up and could not fall back to sleep. He reported episodes of tearfulness and crying spells, and moodiness and irritability through the course of the week. Plaintiff did not appear for his December 2007 appointment. *Id.* at 386.

At his January 2008 appointment, Dr. Kelly prescribed Abilify to replace Geodon, which Plaintiff could not remember to take with meals. *Id.* at 384. Plaintiff reported that his visual hallucinations had stopped, but his auditory hallucinations and paranoia had gotten worse. *Id.* at 383. Plaintiff did not appear for his March 12, 2008 appointment, but Dr. Kelly saw him on March 19, 2008. When he appeared at Unison without an appointment. Plaintiff claimed that his auditory hallucinations and paranoia had increased, and that he was getting into arguments with his brother and mother. *Id.* at 380. Plaintiff did not appear for his May 2008 appointment. *Id.* at 379. At his August 2008 appointment, Plaintiff reported that he had been incarcerated on a forgery charge, which "had something to do with cashing a check," from March 26 to August 8. *Id.* at 377. He was unable to provide any coherent details of the medications he received while incarcerated, so Dr. Kelly resumed the medications prescribed at his March 2008 appointment. He denied any command auditory hallucinations, but reported ongoing paranoia.

At his November 2008 appointment, Plaintiff was upset when he discovered that Dr. Kelly was out on maternity leave and that he would have to see another doctor. *Id.* at 375. He stated that he would wait to see Dr. Kelly when she returned, but when he discovered that he needed prescription refills, he waited for the nurse. At his January 2009 appointment, he reported ongoing problems with paranoia, but denied any severe depression. His auditory hallucinations continued, but he was sleeping through the night. ECF Dkt. #14-15, p. 475. He claimed that dry mouth was the only side effect of the medication. Dr. Kelly reported that Plaintiff was hostile and angry toward the staff but earnest and cooperative with her. She further noted that his mood was "okay" and his affect was guarded, suspicious and euthymic. His thought process was tangential and rambling. He was preoccupied with an incident that occurred when he was three or four years old and he took

-9-

some of his aunt's sleeping pills and was hospitalized. He claimed that he was in a coma, and he believed that his learning disability and his problems in life could be traced to that incident. Dr. Kelly diagnosed Plaintiff with psychotic disorder NOS, dysthymic disorder, and alcohol, cannabis, and cocaine abuse. *Id.* at 476.

After treating Plaintiff for an additional year and a half since her previous assessment, Dr. Kelly prepared a medical source statement concerning the nature and severity of Plaintiff's mental impairment on January 14, 2009. *Id.* at 411-412. The statement consisted of ten questions, seven of which required an assessment of Plaintiff's limitations as less than moderate, moderate, or marked. "Moderate Limitation" is defined as "[a]n impairment which seriously interferes with, and in combination with one or more other restrictions assessed, may preclude the individual's ability to perform the designated activity on a regular and sustained basis." "Marked Limitation" is defined as "[a]n impairment which precludes the individual's ability to function independently, appropriately, and effectively in the designated area on a regular and sustained basis." *Id.* at 411.

Dr. Kelly concluded that Plaintiff had moderate limitations with following simple directions, maintaining concentration for two hour periods of time, performing work at a reasonable pace, withstanding work pressure, and making judgments commensurate with the functions of unskilled work. She found that Plaintiff had marked limitations with interacting with others ("[r]eacts very quickly [and] easily with hostility and paranoia") and keeping a regular schedule ("[d]oesn't keep appointments; usually shows up whenever."). *Id.* at 411-412. The form includes instructions not to include any limitations which would not occur if the individual stopped using alcohol and drugs. *Id.* at 411.

Plaintiff first argues that the ALJ applied an incorrect standard with respect to the treating physician rule. According to the Decision, the ALJ considered Dr. Kelly's opinion and "accorded it significant weight, but not controlling weight as the extreme limitations are not *fully supported* by the medical evidence in the record." ECF Dkt. #14-2, p. 77 (emphasis added). Plaintiff correctly argues that a treating physician's opinion is afforded controlling weight when it is "*well-supported* by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." See 20 C.F.R. §416.927(d)(2)(emphasis added).

-10-

Consequently, it appears that the ALJ applied the wrong standard in this case.

In concluding that Dr. Kelly's opinion was not *fully* supported by the record, the ALJ relies upon Plaintiff's function report, where he claims to take out his mother's trash and do cleaning and laundry, and Dr, White's July 17, 2006 assessment that Plaintiff's test results were invalid because he "put forth poor effort." The ALJ concludes that "[a] review of the exhibit file fails to identify any subjective or objective medical findings which support the claim of inability to work in any capacity. As such, [Dr. Kelly's 2007 assessment] is accorded significant but not controlling weight." *Id.* at 78. He then accorded significant weight to the agency medical opinions of nonexamining physicians because their findings are consistent with other medical evidence in the record. *Id.*

Although the ALJ integrated portions of Dr. Kelly's assessment into the RFC, he clearly rejected her ultimate conclusion that Plaintiff cannot work. If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)). Here, the ALJ purported to give Dr. Kelly's opinion significant weight, but he essentially ignored all of her treatment records when he concluded that her conclusions were not *fully* supported by the record. For that reason, this matter is remanded to the ALJ so that he may address the foregoing factors in according weight to Dr. Kelly's opinion.

A violation of the good reasons rule can be deemed to be "harmless error" if "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) ... even though she has not complied with the terms of the regulation." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir.2010) (quoting *Wilson*, 378 F.3d at 547). None of these requirements have been met in this case.

     For the foregoing reasons, the undersigned REVERSES the Commissioner's decision and REMANDS the case for further factfinding, analysis, and articulation by the ALJ regarding the treating physician's rule and the good reasons requirement consistent with this opinion.

DATE: September 27, 2011

                                                    */s/George J. Limbert*
                                                    GEORGE J. LIMBERT
                                                    UNITED STATES MAGISTRATE JUDGE